# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| ROGER S. ARRONE, | : | |
| Petitioner, | : | |
| | | Case No.  3:07cv00460 |
| vs. | : | |
| | | District Judge Timothy S. Black |
| STATE OF OHIO,[1] | : | Magistrate Judge Sharon L. Ovington |
| Respondent. | : | |

# REPORT AND RECOMMENDATIONS[2]

## I.    INTRODUCTION

Petitioner Roger S. Arrone seeks a writ of habeas corpus relieving him from several state felonious-assault convictions and his resulting present incarceration in the Warren Correctional Institution in Warren County, Ohio.  Arrone wants, in his words, "Justice for the injustice fraught against [him]....  [And] to be granted [a] continuance as a productive member of Society."  (Doc. #3 at 59).

Respondent mainly contends that Arrone's habeas Petition lacks merit when

---

[1]  At the time Arrone filed this case, he was incarcerated in the Lebanon Correctional Institution. *See* Doc. #3.  He has since been transferred to the Warren Correctional Institution in Warren County, Ohio where Michael Sheets is Warden.  *See* www.drc.state.oh.gov.  Warden Sheets is therefore the proper-party Respondent.  *See* Rule 2(a), Rules Governing §2254 Cases.  To maintain docketing continuity, the case caption case should remain the same.

[2]  Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

measured under the standards required by the Antiterrorism and Effective Death Penalty Act of 1996.[3]

The case is presently before the Court upon Arrone's Petition for Writ of Habeas Corpus (Doc. #3), Respondent's Return Of Writ (Doc. #8), and the record as a whole.

## II.    BACKGROUND

### A.    <u>The Beginning</u>

Arrone's convictions arose from his conduct during a roadside incident on the night of December 27, 2004.  During the incident, Arrone verbally threatened several people with a handgun.  He also fired the handgun into the air and into the window of a parked truck, near the driver and a passenger, who were luckily unwounded.  Arrone then pointed the gun at the driver's head and yelled, "I'll shoot him...."  (Doc. #8, Exhibit 22 at 307[4]).

The driver – who happened to be a military medic and an expert martial artist – disarmed Arrone (remarkably) after a brief struggle.  Arrone now found himself (at least potentially) in the same dangerous position – facing the business end of a handgun – in which he had placed his victims.  With the table thus turned against him, Arrone ran away. He was arrested later that night.

A grand jury in the Greene County, Ohio Court of Common Pleas indicted Arrone on three counts of felonious assault, a crime described in Ohio Rev. Code §2903.11(A)(2).

---

[3] Pub.L. No. 104-132, 110 Stat. 1214.

[4] Citations to specific pages in documents of record refer to the page numbers assigned by the Court's case management electronic case filing system.

Each charged count contained a firearm specification.  (Doc. #8, Exh. 1).

Before Arrone's jury trial began, his counsel filed two Motions asking the judge (1) to suppress any statements Arrone had purportedly made to police upon his arrest, and (2) to suppress identification testimony.  (Doc. #8, Exhs. 3, 4).  Arrone's counsel also filed a Motion to Sever the three charged counts, hoping to secure a separate trial on each.  *Id*., Exh. 5.

The trial judge held an evidentiary hearing on two dates, the first on March 31, 2005. Before the second hearing date, on May 6, 2005, Arrone became dissatisfied with his counsel.  This is seen in his pro se Motion for Legal Counsel Termination filed in April 2005.  (Doc. #8, Exh. 6).  Arrone wrote, "I have been appointed legal representation, but not to my best interest.  His representation has been modest towards these false allegations, legal procedures, however I would like to terminate [defense] counsel from this case and be appointed new punishment and[/]or to prove my innocense.  *Id*.  The trial judge denied Arrone's Motion in a brief entry filed on April 28, 2005.  *Id*., Exh. 7.  But this did not fully resolve the matter; it would arise again later, on the first day of Arrone's trial.

The next chronological event occurred when the trial judge concluded the evidentiary hearing and issued a written decision denying Arrone's Motion to Sever and denying each Motion to Suppress with one exception: he suppressed certain statements Arrone had allegedly made on the day of his arrest.  *Id*., Exh. 8.

Arrone's attorney then filed another pre-trial Motion to Suppress together with a Motion in Limine seeking to exclude from trial any evidence of taped telephone

3

conversations from jail between Arrone and his girlfriend.  (Doc. #8, Exh. 9).  On day one of trial, Arrone's attorney argued the remaining Motion to Suppress and Motion in Limine. The trial judge denied the Motions, *see* Doc. #8, Exh. 41 at 461-62, and filed a corresponding Entry, *see* Doc. #8, Exh. 11.

Arrone's counsel next raised an oral motion asking the trial judge to disqualify himself.  Arrone's counsel explained:

> "It's been maybe three weeks ago, something like that, we had a conference and ... I was trying to get some guidelines as to possible sentencing options, possible plea arrangements, didn't succeed too much, and I came back and talked to him [Arrone] with what I garnered to be the position that the Court may be taking, which was, if you [Arrone] go trial and act the way you did at your motion hearings and don't present any kind of viable defense, you're going to get more time than if, in fact, you take responsibility and plead.  And then I quoted, I said, 'The Judge seems to feel that if you act the way you did in Court and if you present yourself and if the facts play out the way they seem to be playing out, that you're the kind of person that shouldn't see the light of day for a long time.'
>
> I commented on that as a possibility of consideration he ought make in whether he should enter a plea or not; not the only consideration, one of many, and he finds that that may indicate a certain bias or prejudice against him before trial or before sentencing, so he's insisting that I make this oral motion."

(Doc. #8, Exh. 41 at 465-66).  In response, the trial judge asked Arrone to "elaborate a little bit" on his counsel's comments.  Arrone stated, "I just want a fair trial, that's all."  *Id*. at 466.  The judge asked, "why do you feel that I cannot preside over your trial, which would be fair?"  *Id*.  Arrone answered, "Because I filed motions for another attorney.  You told me that – they said that my best interest is for me to stick with him.  I felt that it wasn't in my best interest to stick with him."  *Id*.

4

After further discussion, the trial judge explained:

> "Well, the key here Mr. Arrone, is I want to see that you receive a fair trial.  If you tell me you have concerns, I'm going to be active in attempting to see that those concerns are addressed and no unfairness will occur.  Now trial doesn't mean everything goes your way, but there is a process that says you should be treated fairly.  If you present to me concerns and issues in your mind, I will do my best to address those issues...."

*Id*. at 469.  As to his possible sentence, the trial judge informed Arrone:

> "Now, I did mention earlier this is a second degree felony.  There's three counts of second degree felonies.  Under Ohio law, there's a presumption of prison for those offenses.  In addition, you are charged with a firearm specification which calls for a mandatory prison term.
>
> So if you are found guilty, I think it would be fair to say, particularly with a firearm specification being found guilty as well, that a prison term is likely.  What the extent of that term will be, I cannot tell anyone at this point in time because, again, you've not been found guilty of anything.  So I think that's a fair comment of what I told your attorney previously and I will say it to you on the record now."

*Id*. at 470.

The trial judge next asked Arrone if he had any additional concerns.  Arrone once again expressed dissatisfaction with his counsel.  He stated that it seemed like his counsel did not care, explaining:  "he talks to me like I'm a child or something....  He talks to me like I'm just nothing....  So I feel I should be able to fire him and get another counsel on grounds to build a better defense for myself."  (Doc. #8, Exh. 41 at 471).  Arrone asked the trial judge for fifteen or twenty minutes so he could discuss his defense with his attorney.  The trial judge gave Arrone fifteen minutes to discuss his questions with his attorney.  *Id*. at 472.  The trial then proceeded.  *Id*. at 473.  Throughout trial the same attorney represented Arrone

5

without substitution.

At the conclusion of trial, a jury found Arrone guilty on each count of felonious assault and on each firearm specification.  (Doc. #8, Exh. 12).  The trial judge sentenced him to a total of seventeen years imprisonment.  *Id*., Exh. 13.

### B.     Short-Lived Appeal; Return To Trial Court

Arrone, through counsel, filed a direct appeal of his convictions in the Ohio Court of Appeals.  His counsel, however, soon filed a Notice stating that Arrone "dismisses the instant appeal as untimely in that there remains one unresolved issue to be raised in the trial court."  (Doc. #8, Exh. 15).  The Ohio Court of Appeals dismissed Arrone's appeal.  *Id*., Exh. 16.

Arrone returned to the trial court where he argued that a reduction of his sentence to a total of eleven years was warranted because his consecutive sentences "are illegal" under *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 59 L.Ed.2d 403 (2004).  (Doc. #8, Exh. 17).  The judge rejected Arrone's contention, finding, "the Blakely decision does not preclude this Court from imposing the sentence that it did in this case."  *Id*., Exh. 18 at 224.

### C.     Further State Proceedings

Arrone re-initiated his direct appeal (through new appellate counsel) raising eight main challenges to his conviction and sentence.  (Doc. #8, Exh. 20).  The Ohio Court of Appeals rejected each challenge with the exception of Arrone's contention that the imposition of consecutive sentences violated his constitutional rights as set forth in *Blakely*. The Ohio Court of Appeals agreed, relying on the then-recent *State of Ohio v. Foster*, 109

Ohio St.3d 1 (2006), which found certain aspects of Ohio's sentencing scheme constitutionally flawed under *Blakely*.  (Doc. #8, Exh. 22 at 334).  Arrone's case was remanded for re-sentencing.

At this point, Arrone's case divided into separate proceedings: his re-sentencing in the trial court and his ongoing direct appeal in the Ohio Supreme Court.  Neither proceeding provided much solace to Arrone.  The trial judge re-sentenced Arrone to his original seventeen-year sentence, which Arrone did not appeal.  *Id.*, Exh. 33.  And the Ohio Supreme Court dismissed Arrone's ongoing direct appeal "as not involving any substantial constitutional question."  *Id.*, Exh. 25.

Back in the trial court, Arrone filed two pro se Motions for Judicial Release explaining that he had been successfully rehabilitated and asking the trial judge for a second chance "to accompany and secure the safety of [his] loved ones, and be a re-born member of society, successfully."  (Doc. #8, Exh. 34; *see* Exh. 36).  The trial judge denied each motion, finding Arrone ineligible for judicial relief because he was serving a sentence longer than ten years.  *Id.*, Exhs. 35, 37 (citing Ohio Rev. Code §2929.20).

The only other litigation path Arrone took in the Ohio courts involved his petition to vacate or set aside conviction or sentence under Ohio Rev. Code §2953.21.  (Doc. #8, Exhs. 26-30).  The trial judge dismissed Arrone's petition as meritless.  *Id.*, Exh. 30.  His appeal to the Ohio Court of Appeals was unsuccessful.  *Id.*, Exh. 32.  And he did not seek further review in the Ohio Supreme Court.

With nowhere else to seek relief in the Ohio courts, Arrone turned to this Court with

his presently pending habeas corpus Petition.

**III.    Federal Habeas Corpus**

The United States District Courts have the authority to grant a writ of habeas corpus

to a prisoner who is state custody "in violation of the Constitution . . . of the United States."

28 U.S.C. §2241(a), (c)(3).  The Anti–Terrorism and Effective Death Penalty Act (AEDPA)

limits the reach of the modern (post-April 1996) writ of habeas corpus "'with respect to

claims adjudicated on the merits in state court.'"  *Coomer v. Yukins*, 533 F.3d 477, 484 (6th

Cir. 2008)(quoting *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389

(2000)).  The AEDPA applies to the present case because Arrone filed his federal habeas

Petition in December 2007, more than a decade after the AEDPA became effective (in April

1996).  *See Lindh v. Murphy*, 521 U.S. 320, 323, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997);

*see also Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008).

The AEDPA constrains federal habeas review of state court decisions through two

key clauses:  the "contrary to" clause and the "unreasonable application" clause.  The

clauses appear as follows:

> "An application for writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted with
> respect to any claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim –
>
>> (1) resulted in a decision that was **contrary to**, or involved an
>> **unreasonable application of**, clearly established Federal law, as
>> determined by the Supreme Court of the United States...."

28 U.S.C. §2254(d) (emphasis added).  The clauses "contrary to" and "unreasonable

8

application" have independent meanings:

> "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law or if the state court decides a case differently than th[e Supreme] Court has on a set of materially indistinguishable facts.  Conversely, [u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.  A state court need not cite Supreme Court cases on point or even be aware of such cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."

*Coomer*, 533 F.3d at 484 (quoting *Williams*, 529 U.S. at 412-13) (other citation and quotation marks omitted)(brackets in *Coomer*).  "A federal habeas court may not find a state adjudication to be 'unreasonable' 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Mills v. Cason*, 572 F.3d 246, 250 (6th Cir. 2009).

The AEDPA-driven review considers the petitioner's claims in light of Supreme Court case law as it existed at the time of the final state court decision.  *Coomer*, 533 F.3d at 484 (citing *Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)).

## IV.  <u>Discussion</u>

Arrone's habeas corpus Petition raises five claims.  Each will be reviewed individually.

### A.  <u>Claim One</u>

The Sixth Amendment to the United States Constitution states:  "In all criminal

prosecutions, the accused shall ... have the Assistance of Counsel for his defense."

Arrone asserts a violation of his Sixth Amendment rights as follows:

"Where a defendant in a criminal case makes a timely request to substitute counsel and demonstrates that a complete breakdown in attorney-client communication exists that hampers the effective defense of the defendant, it is violative of the Sixth and Fourteenth Amendments as well as [an] abuse of discretion to refuse to substitute counsel[.]"

(Doc. #3 at 60).  The Ohio Court of Appeals began its review of this claim with a discussion of Sixth Amendment law, citing many state cases.  (Doc. #8, Exh. 22 at 309-10).  Yet its discussion correctly reflects the substance of the Supreme Court's Sixth Amendment holdings, *see* Doc. #22 at 309-10, and was consistent with the Supreme Court holdings summarized in *Wheat v. United States*, 486 U.S. 153, 158-59, 108 S.Ct. 1692, 1696-97, 100 L.Ed2d 140 (1988):

"In United States v. Morrison, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981), we observed that this right was designed to assure fairness in the adversary criminal process. Realizing that an unaided layman may have little skill in arguing the law or in coping with an intricate procedural system, Powell v. Alabama, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932); United States v. Ash, 413 U.S. 300, 307, 93 S.Ct. 2568, 2572-73, 37 L.Ed.2d 619 (1973), we have held that the Sixth Amendment secures the right to the assistance of counsel, by appointment if necessary, in a trial for any serious crime. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).  We have further recognized that the purpose of providing assistance of counsel 'is simply to ensure that criminal defendants receive a fair trial,' Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984), and that in evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.'  United States v. Cronic, 466 U.S. 648, 657, n. 21, 104 S.Ct. 2039, 2046 n. 21, 80 L.Ed.2d 657 (1984). Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to

> ensure that a defendant will inexorably be represented by the lawyer whom he prefers. See Morris v. Slappy, 461 U.S. 1, 13-14, 103 S.Ct. 1610, 1617-1618, 75 L.Ed.2d 610 (1983); Jones v. Barnes, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

486 U.S. 153, 158-59, 108 S.Ct. 1692, 1696-97.

In the present case, the Ohio Court of Appeals expressly relied on *Morris v. Slappy*, 461 U.S. 1, 103 S.Ct. 1610 (1983) in support of its recognition that "[t]he Sixth Amendment does not require that a defendant and his defense counsel develop a 'meaningful relationship.' Rather the Sixth Amendment merely requires that defense counsel represent a defendant in a competent and effective manner." (Doc. #22 at 309)(citations omitted). This is a correct reading of *Morris*, 461 U.S. at 13-14, 103 S.Ct. 1610, 1617-18, and is likewise directly supported by *Wheat*, 486 U.S. at 158-59, 108 S.Ct. at 1696-97. For these reasons, the Ohio Court of Appeals' discussion was not contrary to the Supreme Court's Sixth Amendment holdings. *Pudelski v. Wilson*, 576 F.3d 595, 607 (6th Cir. 2009)("A 'run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within §2254(d)(1)'s 'contrary to' clause.")(quoting *Williams*, 529 U.S. at 406).

The Ohio Court of Appeal next reviewed the colloquy between the trial judge when Arrone expressed his "displeasure with defense counsel...." (Doc. #22 at 310-13). The Ohio Court of Appeals then rejected Arrone's claim, reasoning:

> "In the instant case, the record demonstrates that the trial court correctly found that a 'complete breakdown in the attorney-client relationship' had not occurred so as to warrant a change in defense counsel. Defense counsel filed numerous pre-trial motions for Arrone including multiple motions to suppress

and a motion in limine to exclude taped jail calls from Arrone to Frusha [his girlfriend].  Defense counsel stated that he had visited Arrone approximately seven times at the jail in order to prepare his case for trial. There is nothing in the record which suggests that defense counsel was neglectful in his representation of Arrone.  Simply because a defendant feels that defense counsel is acting in a condescending manner towards him is not a basis upon which a trial court can grant a motion for substitution of counsel.  Defense counsel in the present case performed his duties as Arrone's attorney in a competent and attentive manner.  Thus, the trial court did not abuse its discretion when it denied Arrone's request for substitution of counsel."

(Doc. #8, Exh. 22 at 313)(brackets added).  The Ohio Court of Appeals' analysis did not did not involve an unreasonable application Supreme Court precedent.  The Ohio Court of Appeals found that Arrone's counsel had performed his duties competently and attentively – and not neglectfully – and further found an absence of a complete breakdown in the attorney-client relationship between Arrone and his counsel.  This was the proper analytical focus.  By focusing on the specifics of defense counsel's performance, the Ohio Court of Appeals appropriately emphasized the adversarial role he played rather and correctly discounted the significance of the condescending or obnoxious comments defense allegedly made to Arrone.  *See Wheat*, 486 U.S. at 158-59 ("in evaluating Sixth Amendment [right-to-counsel] claims, the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.") (brackets added; quotation marks omitted).

Accordingly, the Ohio Court of Appeals' rejection of this Sixth Amendment claim was neither contrary to nor an unreasonable application of clearly established Supreme Court case law.

**B.**     **Claim Two**

12

The Due Process Clause of the Fourteenth Amendment mandates "'a fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley* 520 U.S. 899, 904-05, 117 S.Ct. 1793, 1797, 138 L.Ed.2d 97 (1997) (quoting in part *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975)) (other citations omitted). Arrone asserts a violation of this right in his second ground for relief:

> "Where a trial court demonstrates an intent to impose a harsher sentence upon a defendant as a 'trial tax' if the defendant insists upon a trial, it is violative of the Fifth, Sixth, and Fourteenth Amendments for the judge to refuse to recuse himself upon proper motion...."

(Doc. #3 at 60).

The Ohio Court of Appeals began its discussion of this claim by reviewing the trial record and quoting it at some length. (Doc. #8, Exh. 22 at 313-16). The Ohio Court of Appeals then rejected Arrone's judicial bias claim, reasoning:

> "It is abundantly clear from the above excerpt [quoting the record] that the trial judge was not prejudiced against Arrone for exercising his right to trial. The trial judge, after listening to Arrone's inartfully phrased complaints, slowly and deliberately explained the trial process to him. The trial judge then explained his own thought process with respect to sentencing and that he would make no decisions on sentencing until a verdict was rendered by the jury. After thoroughly reviewing the record, we find that Arrone has failed to demonstrate any improper conduct or prejudice warranting recusal."

(Doc. #8, Exh. 22 at 317).

The Ohio Court of Appeals' rejection of this claim was not contrary to Supreme Court case law, and the Ohio Court of Appeals did not unreasonably reject Arrone's judicial bias claim. To show a violation of the Fourteenth Amendment due to judicial bias, an accused

13

must not rely on standards applicable under state law "or the professional standards of the bench and Bar."  *Bracy*, 520 U.S. at 904, 117 S.Ct. at 1797; *cf. Fed. Trade Comm'n. v. Cement Inst.*, 333 U.S. 683, 702, 68 S.Ct. 793, 92 L.Ed. 1010 (1948)("most matters relating to judicial disqualification d[o] not rise to a constitutional level.")(citations omitted). Instead, a bias problem of constitutional magnitude arises only when the trial judge's bias deprives the defendant of  "a fair trial in a fair tribunal" – the "constitutional floor" upon which the trial must occur.  *Bracy*, 520 U.S. at 904, 117 S.Ct. at 1797.

The Ohio Court of Appeals' reasoning essentially found that Arrone's allegations when considered in light of the record did not demonstrate the existence of actual judicial bias against him.  *See* Doc. #8, Exh. 22 at 317.  Requiring actual judicial bias was not contrary to clearly established Supreme Court precedent as it existed at the time (August 2006).  The United States Court of Appeals for the Sixth Circuit, after surveying Supreme Court cases in enormous detail, has recognized:

> "In sum, one *could* read the Supreme Court precedent in this area as holding that the probability of bias – based on a likelihood or appearance of bias – can be sufficient to disqualify a judge and violate party's constitutional right to due process.  But, one *could also* read these cases as holding that, other than in cases of contempt arising in a closed (secret) hearing, only actual bias or pecuniary interest-interest-based probability is sufficient – and, moreover, that a matter of mere kinship has, as of yet, never been acknowledged as a sufficiently biasing interest.  Regardless of the preferred readings – or the merits of one reading over the other – the fact that there are two or more reasonable readings compels the conclusion that this precedent is not 'clearly established.'"

*Railey v. Webb*, 540 F.3d 393, 407 (6th Cir. 2008) (italics in original).  Given the lack of clearly established Supreme Court precedent against the actual-judicial-bias standard, the

14

Ohio Court of Appeals' application of the actual bias standard was neither contrary to Supreme Court precedent nor objectively unreasonable nor incorrect.  *See id.* (and Supreme Court cases cited therein).  Indeed, against the backdrop of the Supreme Court cases reviewed in *Railey*, 540 F.3d at 401-07 – *Bracy v. Gramley*, 520 U.S. 899, 117 S.Ct. 1793 (1997); *Aetna Life Ins. Co v. Lavoie*, 475 U.S. 813, 106 S.Ct. 1580 (1986); *In re Murchinson*, 349 U.S. 133, 75 S.Ct. 623 (1955); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437 (1927) – the record, including the Ohio Court of Appeals' reasons, reveals no due process flaw.  Rather, the record demonstrates that the trial judge took care to give Arrone ample opportunity to raise and address each of his concerns.  In doing so, the trial judge repeatedly reminded Arrone that he had not been found guilty of any charged crime.  The trial judge further sought to reassure Arrone that he (the trial judge) intended to insure that Arrone received a fair trial.  And the trial judge explained his prior sentencing comment and why it did not show either that (1) the trial judge held a preconceived belief in Arrone's guilt or (2) the trial judge had pre-determined the specific sentence he intended to impose on Arrone.

Accordingly, the Ohio Court of Appeals' rejection of Arrone's judicial-bias claim was neither contrary to nor an unreasonable application of Supreme Court holdings.

### C.    Claim Three

"The admission of evidence derived from a suggestive identification procedure violates a defendant's right to due process if the confrontation leading to the identification was 'so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.'"  *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th

15

Cir. 2007) (quoting in part *Stovall v. Denno*, 388 U.S. 293, 301-02, 87 S.Ct. 1967, 18

L.Ed.2d 1199 (1967) (other citation omitted).

      Arrone claims a violation of this due process right by arguing:

> "Where unduly suggestive and unreliable show-up identification is made, resulting in a substantial likelihood of misidentification, such identification must be suppressed in light of the Due Process Claus[e] of the Fourteenth Amendment[.]"

(Doc. #3 at 60).

      Addressing this area of law, the Ohio Court of Appeals wrote:

> "A 'show-up' is inherently suggestive....  The question of a whether a show-up of a suspect to alleged victims of crime is unduly suggestive depends upon the totality of the circumstances....
>
> 'The reliability of the identification depends upon the following factors: 1) the opportunity of the witness to see the perpetrator; 2) the witness' degree of attention; 3) the accuracy of the witness' prior description; 4) the witness' level of certainty in the identification; and 5) the length of time between the crime and the confrontation.'"

(Doc. #8, Exh. 22 at 318)(citations omitted).  In these two paragraphs, the Ohio Court of

Appeals correctly set forth Supreme Court precedent.  Indeed, the substance of first

paragraph appears in *Neil v. Biggers*, 409 U.S. 188, 196, 93 S.Ct. 375, 34 L.Ed.2d 401

(1972); the second paragraph quotes *Neil* directly, *id*., 409 U.S. at 196-97.  The Ohio Court

of Appeals decision was consistent with, not contrary to, Supreme Court precedent.

      The Ohio Court of Appeals found no due-process violation in the use at trial of two

pretrial show-up identifications of Arrone.  The identification occurred about ninety minutes

after the incident in question.  The witnesses who identified Arrone were the military

medic/martial arts expert – David Seelenbinder – who had fought with and disarmed Arrone,

and a motorist – Gibson – who had encountered Arrone soon after the incident.  Gibson

thought, based on things Arrone had told him, that Arrone had been robbed.  Gibson went to

a nearby police station and reported his encounter with Arrone.  While there, Gibson

overheard a police dispatch saying they caught the suspect and needed a positive ID.  Police

then asked Gibson if he could identify "the guy that was being robbed."  (Doc. #8, Exh. 22 at

319).

The Ohio Court of Appeals explained in its decision:

"Gibson testified that when he encountered Arrone on the roadway,
Arrone told him that he had just been robbed at gunpoint by the Seelenbinders.
At the time of the encounter, Gibson was unaware that Arrone was the actual
perpetrator of the crime.  When Gibson was taken to the hotel to identify
Arrone, he was still under the impression that he was going to identify the man
whom he though was a robbery victim.  Even so, just because Gibson
overheard the police dispatch identifying Arrone as a possible suspect does not
render the resulting positive identification unduly suggestive.  The fact that
police have a possible suspect is necessarily implied whenever someone is
shown to an alleged crime victim or witness for purposes of identification....

Arrone also argues that the positive identification should be suppressed
because neither ... Seelenbinder nor Gibson were able to immediately identify
Arrone.  This argument is unpersuasive.  The police brought Seelenbinder and
Gibson to the hotel to identify Arrone just ninety minutes after the alleged
robbery occurred.  Both witnesses had ample time to view Arrone unobstructed
at the time of the crimes.  It is also important to note that Seelenbinder and
Gibson viewed Arrone separately to eliminate any taint in the identification
procedure.  The men could not initially see Arrone clearly because he was
seated in a police cruiser and was obscured by glare on its window.  Moreover,
Seelenbinder testified that when Arrone saw him walking up to the cruiser,
Arrone pulled his baseball cap down and twisted around in the seat so
Seelenbinder would not be able to get a good look at him. Once the police
removed Arrone from the cruiser, both men were separately and readily able to
identify him.  Thus, we hold that the trial court properly found that the results

17

of the identification procedure conducted by police were reliable and not unduly suggestive."

(Doc. #8, Exh. 22 at 319-20).

The Ohio Court of Appeals' decision was not an unreasonable application of the standards set in Supreme Court case law such as *Neil*, 409 U.S. at 196-97 and *Stovall*, 388 U.S. at 301-02. The Court of Appeals considered the totality of circumstances surrounding both identifications and examined whether each was reliable under many of the factors applicable under *Neill* – namely, the opportunity of the witness to see the perpetrator; the witness' degree of attention; the witness' level of certainty in the identification; and the length of time between the crime and the show-up identification. *See Neil*, 409 U.S. at 196-97.

Accordingly, the Ohio Court of Appeals' rejection of Arrone's due-process challenge to the show-up identifications was neither contrary to nor an unreasonable application of clearly established Supreme Court holdings.

### D. Claim Four

Arrone claims in his fourth ground for relief:

"Miranda warnings given mid-interrogation, after a defendant has given unwarned statements, are not effective and any such statements are inadmissible at trial pursuant to the Fifth Amendment[.]"

(Doc. #3 at 60).

*Miranda*, of course, refers to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), where the Court held that a suspect in police custody

"must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation.  After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."

384 U.S. at 479 (footnote omitted).

When addressing Arrone's *Miranda* arguments, the Ohio Court of Appeals explained

that the trial judge had excluded from trial evidence certain statements Arrone made after his

arrest in response to questioning by Deputy Seifert.  (Doc. #8, Exh. 22 at 322).  Finding no

*Miranda* violation, the Ohio Court of Appeals wrote:

"At issue in the present appeal, however, are spontaneous, incriminating statements made by Arrone in the police cruiser which were not the result of any interrogation by Deputy Seifert.  'The procedural safeguards identified in *Miranda* apply only when a suspect is subjected to 'custodial interrogation,' which means questioning initiated by law enforcement officers after a person has been taken into custody.'  *State v. Johnson* (March 25, 2005), Montgomery App. No. 20624, 2005-Ohio-1367, citing *State v. Hoffner* (2004) 102 Ohio St.3d 358, 811 N.E.2d 48, 204-Ohio-3430.  The statements allowed into evidence by the trial court were allegedly made by Arrone after Deputy Seifert had curtailed his questioning.  We agree with the trial court that the statements Arrone volunteered after Deputy Seifert had stopped questioning him are not protected by *Miranda* safeguards.  'Statements made on the subject's own initiative in the absence of questions or other conduct by police do not constitute 'interrogation.' '  *Johnson*, supra, citing *City of Akron v. Milewski*, (1985), 21 Ohio App.3d 140, 487 N.E.2d 582.  Thus, the trial court did not abuse its discretion when it allowed into evidence the statements Arrone made after Deputy Seifert had stopped questioning him."

(Doc. #8, Exh. 22 at 322-23).

19

The Ohio Court of Appeals' recognition that Arrone's volunteered statements after Officer Seifert stopped questioning him was not contrary to, and did not involve an unreasonable application of, Supreme Court case law.  As stated in *Miranda*, "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."  384 U.S. at 478, 86 S.Ct. 1602; *cf. Tolliver v. Sheets*, 594 F.3d 900, 920 (6th Cir. 2010) (AEDPA case:  "Police may listen to volunteered statements, and need not interrupt a suspect who is volunteering information in order to deliver a *Miranda* warning." (citing *Miranda*, 384 U.S. at 478)).

The Ohio Court of Appeals also found that Arrone's statements to Detective Walton on the day after his arrest were the product of Arrone's knowing and voluntary waiver of his *Miranda* rights.  (Doc. #8, Exh. 22 at 323).  The Ohio Court of Appeals based this conclusion on the fact that Detective Walton apprised Arrone of his constitutional rights and that before Arrone provided any statements he signed a "*Miranda* waiver form."  *Id*.  The Court of Appeals further reasoned: "Detective Walton testified that when he apprised him of his constitutional rights, Arrone was not under the influence of any drugs or alcohol, nor was he coerced into making a statement concerning the alleged crime."  *Id*.  In this manner, the Ohio Court of Appeals' decision was not contrary to the *Miranda*-waiver standards clearly established by the Supreme Court and did not involve an unreasonable application of those standards to the events and circumstances when Arrone signed the *Miranda*-waiver form. *See Miranda,* 384 U.S. at 444*; see Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

20

The Ohio Court of Appeals' decision gives pause on only one *Miranda* matter –

Arrone's intoxication at the time Officer Seifert questioned him.  The Ohio Court of Appeals

explained:

> "The trial court explicitly found that in light of Arrone's 'apparent
> intoxication, the Court can not [sic] assume that Defendant did in fact
> knowingly, intelligently, and voluntarily waive[ ] the exercise of his <u>Miranda</u>
> rights.'  Thus, even if the trial court believed Deputy Seifert's testimony that
> he had properly *Mirandized* him, the trial court held that Arrone's degree of
> intoxication rendered him unable to provide a knowing and intelligent waiver
> of his constitutional rights.  In light of this finding, the trial court suppressed
> any statements Arrone made in response to questioning by Deputy Seifert."

(Doc. #8, Exh. 22 at 322).  Neither the trial judge nor the Ohio Court of Appeals considered

Arrone's apparent intoxication when allowing into evidence the statements he volunteered

after Officer Seifert's questioning stopped.  This anomaly, however, presents no basis for

habeas relief under the AEDPA because the Supreme Court had not addressed this situation

or reached any specific holding about the negative impact a suspect's intoxication can have

on the voluntariness of his own-initiated statements.  *Cf. Colorado v. Connelly*, 479 U.S.

157, 167 107 S.Ct. 515, 522 (1986)("a defendant's mental condition, by itself and apart from

its relation to official coercion" is not determinative of whether the statement is voluntary.

Coercive police misconduct must be shown.); *cf. also Matylinsky v. Budge*, 577 F.3d 1083,

1095 (9th Cir. 2009)("While it is true that a waiver of one's <u>Miranda</u> rights must be done

intelligently, knowingly, and voluntarily, 384 U.S. at 444, 86 S.Ct. 1602, the Supreme Court

has never said that impairments from drugs, alcohol, or other similar substances can

negatively impact that waiver.").

Accordingly, the Ohio Court of Appeals' rejection of Arrone's *Miranda* claim was

neither contrary to nor an unreasonable application of clearly established Supreme Court

precedent.

### E.    Claim Five

Arrone claims in his final ground for relief:

> "Where trial counsel demonstrably fails to adequately prepare for trial
> and the defense is prejudiced by such failure, such counsel is ineffective within
> the meaning of the Sixth and Fourteenth Amendments and a resulting
> conviction cannot stand[.]"

(Doc. #3 at 60).

The Ohio Court of Appeals found no merit in this claim under the standards set by

*Strickland v. Washington*, 466 U.S. 668, 687-88 (1986).  (Doc. #8, Exh. 22 at 327-30).  The

Ohio Court of Appeals wrote:

> "'When considering an allegation of ineffective assistance of counsel, a
> two-step process is usually employed.  First, there must be a determination as
> to whether there has been a substantial violation of any of defense counsel's
> essential duties to his client.  Next, and analytically separate from the question
> of whether defendant's Sixth Amendment rights were violated, there must be a
> determination as to whether the defense was prejudiced by counsel's
> ineffectiveness.'"

(Doc. #8, Exh. 22 at 327)(citations omitted).  Referring to this, the Court of Appeals

continued:

> "The above standard contains essentially the same requirements as the
> standard set forth by the United States Supreme Court in *Strickland v.
> Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052.  'When a convicted
> defendant complains of the ineffectiveness of counsel's assistance, the
> defendant must show that counsel's representation fell below an objective
> standard of reasonableness.'  *Strickland*, supra, at 687-688.  'Because of the

22

difficulties inherent in making the evaluation, a court must indulge a strong
presumption that counsel's conduct falls within the wide range of reasonable
professional assistance.' *Id*. Thus, counsel's performance will not be deemed
ineffective unless and until counsel's performance is proved to have fallen
below an objective standard of reasonable representation and, in addition,
prejudice arises from counsel's performance. *Id*.

For a defendant to demonstrate that he has been prejudiced by counsel's
deficient performance, the defendant must prove that there exists a reasonable
probability that, absent counsel's errors, the result of the trial would have been
different. *Bradley*, supra, at 143. A reasonable probability is a probability
sufficient to undermine confidence in the outcome. *Strickland*, supra, at 694."

(Doc. #8, Exh. 22 at 327-28).

The Ohio Court of Appeals correctly described the two-part – performance and

prejudice – showing required under *Strickland*. 466 U.S. at 687-92. As a result, its decision

was not contrary to Supreme Court case law. Beyond this:

"The Supreme Court has made clear that post-AEDPA claims of
ineffective assistance of counsel brought by habeas petitioners will succeed
only in very limited circumstances.... For [the petitioner] to succeed..., he must
do more than show that he would have satisfied *Strickland*'s test if his claim
were being analyzed in the first instance, because under §2254(d)(1), it is not
enough to convince a federal habeas court that, in its independent judgment,
the state-court decision applied *Strickland* incorrectly. Rather, he must show
that the ... [state] Court of Appeals applied *Strickland* to the facts of his case in
an objectively unreasonable manner."

*Payne v. Bell*, 418 F.3d 644, 665 (6th Cir. 2005).

The Ohio Court of Appeals engaged in a *Strickland* analysis and concluded that

defense counsel's performance did not fall below an objective standard of reasonableness. It

did so in a manner consistent with *Strickland* and without engaging in an objectively

unreasonable analysis. For example, the Court of Appeals rejected Arrone's challenges to

23

counsel's cross-examination of medic and expert martial artist David Seelenbinder as

follows:

> "[A] review of the trial transcript indicates that when defense counsel asked David Seelenbinder whether he had mentioned a gun being fired at the suppression hearing, he was pursuing a certain line of questioning designed to elicit a particular answer.  A debatable decision involving trial tactics generally does not constitute a deprivation of effective counsel....
>
> Arrone is unable to overcome the 'strong presumption that defense counsel's performance constituted reasonable assistance.  Many times, a proper course of action is more readily discernible in hindsight.  In this instant, we will not attempt to second guess defense counsel's decision with regard to his questioning of David Seelenbinder.  The same analysis applies to defense counsel's failure to object to portions of Nancy Seelenbinder's testimony.  Counsel's omissions, which could clearly be viewed as trial strategy does not rise to the level of ineffective assistance."

(Doc. #8, Exh. 22 at 329-30)(internal citations omitted).

In this manner, the Ohio Court of Appeal did not unreasonably apply *Strickland*,

which requires only a "fair assessment of attorney performance..., 466 U.S. 689, and which

mandates that courts considering ineffective assistance of counsel claims make "every effort

... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the

time.  Because of the difficulties inherent in making the evaluation, a court must indulge a

strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance....'"  *Strickland,* 466 U.S. at 689.

In addition, Arrone's counsel presented a straightforward closing argument, which

dovetailed with his opening statement, directed largely at the evidentiary weaknesses in the

24

prosecution's case.  He noted that the prosecution did not call a witness, the "one that started the whole thing with Mr. Arrone," although she was readily in jail and available to the prosecution.  (Doc. #22, Exh. 41 at 726).  He directly attacked certain audiotapes presented during trial by the prosecution.  He also emphasized that Arrone did not intend to cause David or Nancy Seelenbinder any serious physical harm with a gun.  And, in summary, he acknowledged that the case was distasteful and unpleasant to hear; he then cogently said, "and as scared as it might have made some of you, angry as it might have made some of you, just as the government asked you not to check your common sense at the door, I ask you not to check your brain at the door, not to let your emotions overwhelm your brain."  *Id*. at 277. From defense counsel's perspective at the time, this constituted a strategic attempt to bond with the jury's likely view of the situation and to thereby become more convincing to the jury, while also properly imploring them not to judge Arrone with their emotions alone. Such strategy did not nullify the presumption that counsel's strategy was within a wide range of reasonable professional assistance due under *Strickland,* 466 U.S. at 689.

Accordingly, the Ohio Court of Appeals' rejection of Arrone's ineffective assistance of counsel claim was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

## V.    CERTIFICATE OF APPEALABILITY

Before Arrone may appeal a denial of his habeas petition, he must first obtain a certificate of appealability.  28 U.S.C. §2253(c)(1)(A).  To obtain a certificate of

appealability when a habeas petition is denied on the merits, the petitioner must make a substantial showing of the denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). This is accomplished by showing that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. *Slack*, 529 U.S. at 484 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)).

If the District Court dismisses the petition on procedural grounds without reaching the merits of the constitutional claims, the petitioner must show that jurists of reason would find it debatable whether the District Court is correct in its procedural ruling. *Slack*, 529 U.S. at 484. The procedural issue should be decided first so as to avoid unnecessary constitutional rulings. *Slack*, 529 U.S. at 485 (citation omitted).

The conclusions that Arrone's claims lack merit for the reasons set forth above are not debatable among reasonable jurists. Arrone's Petition, his supporting materials, his contentions, and the record as a whole do not otherwise present issues adequate to deserve encouragement to proceed further. Consequently, a certificate of appealability should not issue.

## IT IS THEREFORE RECOMMENDED THAT:

1. Roger S. Arrone's Petition for a Writ of Habeas Corpus (Doc. #3) be DENIED and DISMISSED, and a certificate of appealability be DENIED;

2. A certificate of appealability should be denied; and

3. The case be terminated on the docket of this Court.

September 30, 2010

                                                      s/Sharon L. Ovington
                                                      Sharon L. Ovington
                                       United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).